IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Darryl R. Molden, | ) | C/A No.: 1:19-2576-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Donald C. Coggins, United States District Judge, dated July 15, 2020, referring this matter for disposition. [ECF No. 21]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 30].

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow,

the undersigned reverses and remands the Commissioner's decision for further proceedings as set forth herein.

## I.    Relevant Background

### A.    Procedural History

On January 22, 2017, Plaintiff protectively filed an application for DIB in which he alleged his disability began on September 20, 2016. Tr. at 159–61, 162–63. His application was denied initially and upon reconsideration. Tr. at 90–93, 97–103. On November 1, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ronald Fleming. Tr. at 27–58 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 25, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 9–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 12, 2019. [ECF No. 1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 51 years old at the time of the hearing. Tr. at 33. He completed one year of college. Tr. at 35. His past relevant work ("PRW") was as an informal youth counselor, a janitor, a material handler, and a kitchen

helper. Tr. at 54. He alleges he has been unable to work since May 1, 2017.[1] Tr. at 32.

### 2.    Medical History

Plaintiff visited Jarrod A. Reynolds, M.D. ("Dr. Reynolds"), for a compensation and pension ("C&P") exam for pes planus on May 16, 2016. Tr. at 396–404. Dr. Reynolds indicated Plaintiff's related diagnoses included plantar fasciitis, degenerative arthritis of the bilateral feet, and bilateral plantar warts. Tr. at 397. Plaintiff reported pain and swelling in his feet and indicated his symptoms were worse in the early morning and when he walked a lot. Tr. at 398. He said his conditions prevented him from walking very far, standing for long periods, and playing ball. *Id.* Dr. Reynolds indicated Plaintiff experienced the following contributing factors bilaterally: incoordination, impaired ability to execute skilled movements smoothly; pain on movement; pain on weight-bearing; instability of station; disturbance of locomotion; and interference with standing. Tr. at 402. He indicated Plaintiff had difficulty ambulating and standing during flare-ups or when his feet were used repeatedly. Tr. at 402–03. He noted Plaintiff had difficulty with ambulating and standing that would functionally impact his employment status. Tr. at 404.

---

[1] Prior to the hearing, Plaintiff moved to amend his alleged disability onset date to coincide with his fiftieth birthday. Tr. at 32, 178.

On November 4, 2016, Plaintiff presented to Venus C. Hamilton, LISW-CP ("SW Hamilton"), as a walk-in. Tr. at 376. He reported a desire to initiate mental health treatment. Tr. at 377. SW Hamilton observed Plaintiff to be neatly dressed, to demonstrate anxious speech, to have poor eye contact, to demonstrate anxious motor activity, and to have a tearful affect and anxious mood. *Id.* Plaintiff endorsed fleeting suicidal and homicidal ideation, but denied auditory and visual hallucinations. *Id.* He reported a history of alcoholism and legal issues from driving under the influence ("DUI"). *Id.* SW Hamilton noted Plaintiff was cooperative and had good insight and judgment. *Id.* Plaintiff indicated he had experienced two traumatic events while enlisted in the military. *Id.* He endorsed insomnia, paranoia, a history of alcoholism, a history of fighting, and disrupted relationships. *Id.* SW Hamilton referred Plaintiff for additional services. *Id.*

Plaintiff presented to Amber Ratchford, M.D. ("Dr. Ratchford"), for a psychiatric intake consultation on November 21, 2016. Tr. at 330. He indicated his wife had encouraged him to seek treatment. Tr. at 331. He endorsed irritability, decreased motivation, poor sleep, daytime fatigue, hypervigilance, isolation, and depression. *Id.* He denied manic symptoms, hallucinations, and excessive worry. *Id.* He admitted to drinking a liter of alcohol every two days. *Id.* He reported traumatic events while serving in the military that included: (1) an attempted sexual assault during basic training

4

and (2) an unsuccessful attempt to save the life of a friend who jumped out a window and hanged himself. Tr. at 332. Dr. Ratchford noted the following on a mental status exam ("MSE"): casually dressed; no psychomotor agitation or retardation; normal rate, volume, and articulation of speech; grossly intact cognition; oriented to person, place, and situation; irritable mood; affect congruent to topic; linear, goal-directed thought process; no hallucinations or over-delusional thought process; no suicidal or homicidal ideation; and fair insight and judgment. Tr. at 333. Her diagnostic impressions were posttraumatic stress disorder ("PTSD") and alcohol use disorder. Tr. at 334. She prescribed Sertraline and instructed Plaintiff to take 50 mg initially and titrate his dose up to 100 mg. *Id.* She also prescribed Hydroxyzine 25–50 mg as needed for sleep. *Id.* She encouraged Plaintiff to follow up on counseling for substance use disorder. *Id.* Plaintiff presented for a substance abuse treatment program ("SATP") evaluation on December 6, 2016. Tr. at 328.

Plaintiff presented to Dena L. Russell, LISW-CP ("SW Russell"), for a psychosocial assessment on December 12, 2016. Tr. at 360. He endorsed grief from the death of his son, who died of leukemia at age 10 in 2001. Tr. at 361. He reported marital conflict and a history of two prior divorces. *Id.* He indicated he was unemployed and obtaining treatment for substance abuse. *Id.* He reported he starting drinking after being assaulted in a shower during basic training. Tr. at 363. He endorsed guilt over having witnessed a suicide

and anger over being unable to visit his youngest son. *Id.* He reported depressive symptoms that included depressed mood, loss of pleasure/interest, insomnia, loss of energy, feeling bad about himself, difficulty concentrating, and occasional suicidal ideation. Tr. at 364. He endorsed symptoms of PTSD that included nightmares, flashbacks, intrusive memories, being easily startled, hypervigilance, negative cognitions and feelings, isolating, difficulty concentrating, and irritability/anger. *Id.* SW Russell described Plaintiff as neatly groomed and dressed appropriately; alert and oriented times four; having a cooperative attitude, dysthymic mood, and dysthymic and tearful affect; and demonstrating normal motor movement and speech and logical and goal-directed thought process. *Id.* Plaintiff denied auditory hallucinations, but reported sometimes seeing the face of the friend who committed suicide in front of him. *Id.* He endorsed suicidal ideation, but denied intent and plan. *Id.* He reported homicidal ideation as to his youngest son's mother, but said he would not act on it because it would harm his son. *Id.* SW Russell noted Plaintiff had good motivation for therapy and fair judgment and insight. *Id.* Plaintiff's score on a patient health questionnaire ("PHQ") was consistent with severe depression. Tr. at 366.

On December 30, 2016, SW Russell observed Plaintiff to be neatly groomed and dressed appropriately; to be alert and oriented times four; to have a cooperative attitude and a dysthymic mood and affect; to demonstrate

normal motor movement and speech and logical and goal-directed thought process; and to deny suicidal or homicidal ideation, intent, or plan. Tr. at 355. Plaintiff reported anxiety and anger when approached by others from behind. *Id.* He indicated his cousin had repeatedly approached him from behind on Christmas, and it had nearly led to a physical altercation. *Id.* Plaintiff reported having decreased his alcohol intake. *Id.* He indicated he was angry with his child's mother because she had not permitted visitation for four months. *Id.*

Plaintiff presented to Zaixiao Zhang, M.D. ("Dr. Zhang"), for an initial evaluation and medication assessment on January 13, 2017. Tr. at 510. He reported self-isolation, depression, frequent nightmares, flashbacks, hyperarousal, hypervigilance, avoidance, mood swings, anhedonia, easy agitation, feelings of worthlessness and hopelessness, and chronic passive suicidal thoughts. Tr. at 510–11. He indicated his wife kept his guns in a safe to protect him. Tr. at 511. He endorsed a long history of alcohol abuse and a history of DUI. *Id.* He said he had difficulty working because he could not deal with people and was easily anxious and angry. *Id.* Dr. Zhang observed Plaintiff to be dressed casually; to maintain good eye contact; to have normal rate, tone, and volume of speech; to endorse good mood; to have a bright affect; to demonstrate a logical, linear, and goal-directed thought process; to deny suicidal and homicidal ideation and auditory and visual hallucinations;

to show no signs of psychosis; to be alert and oriented times four; to have good recent and delayed memory; to show good concentration skills; and to have fair insight and judgment. Tr. at 512. He assessed unspecified depressive disorder, unspecified anxiety disorder, and severe alcohol use disorder. *Id.* He advised Plaintiff to take his medication as prescribed and to continue the SATP and peer support group. Tr. at 512–13.

On January 18, 2017, SW Russell observed Plaintiff to be neatly groomed and dressed appropriately; to be alert and oriented times four; to have a cooperative attitude and a dysthymic mood and affect; to demonstrate normal motor movement and speech and logical and goal-directed thought process; and to deny suicidal or homicidal ideation, intent, or plan. Tr. at 353. Plaintiff endorsed external emotional distress that was exacerbated by a conflict with his child's mother over visitation. *Id.* SW Russell introduced Plaintiff to the mindfulness concept. Tr. at 353–54.

On January 25, 2017, SW Russell described Plaintiff's mood as dysthymic and his affect as tearful and dysthymic. Tr. at 504. She worked with Plaintiff on mindfulness and distress tolerance skills. *Id.*

On February 1, 2017, SW Russell observed Plaintiff to be neatly groomed and dressed appropriately; to be alert and oriented times four; to have a cooperative attitude, a dysthymic mood, and a dysthymic, tearful affect; to demonstrate normal motor movement and speech and logical and

goal-directed thought process; and to deny suicidal or homicidal ideation, intent, or plan. Tr. at 351. She worked with Plaintiff on mindfulness skills, and he found it calming and reported feeling more centered. *Id.*

Plaintiff reported having completed the first phase of the SATP on February 8, 2017. Tr. at 350. SW Russell encouraged him to continue to the next phase. *Id.* She reviewed core mindfulness skills with Plaintiff. *Id.*

On February 15, 2017, SW Russell observed Plaintiff to be neatly groomed and dressed appropriately; to be alert and oriented times four; to have a cooperative attitude and a dysthymic mood and affect; to demonstrate normal motor movement and speech and logical and goal-directed thought process; and to deny suicidal or homicidal ideation, intent, or plan. Tr. at 349. She worked on crisis survival skills with Plaintiff. *Id.*

On February 22, 2017, SW Russell observed Plaintiff to be neatly groomed and in appropriate attire; alert and oriented times four; to have a cooperative attitude and dysthymic mood and affect; to demonstrate normal motor movement and speech; to deny suicidal and homicidal ideation; and to show a logical and goal-directed thought process. Tr. at 348. Plaintiff failed to properly complete worksheets for crisis urges, and SW Russell explained the assignment again and encouraged him to complete it prior to his next visit. *Id.*

Plaintiff presented for an annual primary care exam on February 27, 2017. Tr. at 475. He complained of chronic bilateral knee pain he described as worse on the right and a seven of 10. *Id.* He also reported a mass on his right inner thigh that appeared and resolved intermittently. *Id.* Luis Maybit, M.D. ("Dr. Maybit"), observed a hard mass on Plaintiff's upper right inner thigh. Tr. at 476. He indicated x-rays of Plaintiff's knees showed some mild bilateral patellar spurring and some loss of patellofemoral joint space. Tr. at 477. Plaintiff admitted he had not been taking medication for hypertension. *Id.* Dr. Maybit encouraged Plaintiff to take his medication and ordered an ultrasound of the right upper thigh and repeat x-rays. *Id.* He indicated Plaintiff should consider Metformin for diabetes. Tr. at 478.

Plaintiff attended psychotherapy with SW Russell on March 1, 2017. Tr. at 472. SW Russell noted Plaintiff's mood and affect were dysthymic, but provided otherwise normal findings on an MSE. *Id.* Plaintiff reported he had cancelled appointments for the SATP because they conflicted with his other appointments. Tr. at 472–73.

Plaintiff presented to Dr. Zhang for psychiatric follow up on March 6, 2017. Tr. at 468. He generally reported "everything [was] good," but admitted to feeling depressed, isolating for up to a week at a time, awakening easily, and continuing to drink a reduced amount of alcohol. *Id.* He endorsed decreased energy and said he could not be around a lot of people. *Id.* Dr.

Zhang indicated no abnormalities on MSE. Tr. at 467. He prescribed Naltrexone 50 mg daily and encouraged Plaintiff to continue the SATP and attend a peer support group. *Id.*

Plaintiff presented to Derek M. Clark, PT, DPT ("PT Clark"), for a physical therapy consultation for knee pain on March 7, 2017. Tr. at 465. He described sharp, throbbing pain that was exacerbated by ambulation. *Id.* PT Clark observed Plaintiff to be ambulating with a standard cane and to demonstrate an antalgic gait. *Id.* He noted bilateral knee flexion to 120 degrees and extension to five degrees. *Id.* He indicated bilateral joint-line tenderness and muscle tightness. Tr. at 465–66. PT Clark stated Plaintiff displayed decreased strength and flexibility and increased pain, pressure, and sensitization in the bilateral knees. Tr. at 466.

Also on March 7, 2017, Plaintiff presented to kinesiotherapist Eulela Flemming ("Ms. Flemming"), for a walking device assessment. Tr. at 467. He reported knee pain and indicated his knees had given out. *Id.* Ms. Flemming noted normal gross strength and limited gross range of motion ("ROM"). *Id.* She provided gait and stair training and concluded Plaintiff was able to safely use a cane. *Id.*

On March 8, 2017, SW Russell noted Plaintiff's mood and affect were dysthymic, but other findings on MSE were normal. Tr. at 464. Plaintiff had

completed distress tolerance worksheets prior to the appointment, and SW Russell worked with him on distress tolerance. *Id.*

On March 10, 2017, an ultrasound showed no obvious mass in the right thigh. Tr. at 555. X-rays of the bilateral knees showed mild degenerative joint disease at the patellofemoral and femorotibial joint compartments of each knee. Tr. at 554.

On March 22, 2017, SW Russell noted Plaintiff's mood and affect were dysthymic, but otherwise indicated normal findings on MSE. Tr. at 457. Plaintiff reported increased stress as a result of his daughters getting in trouble at school. Tr. at 457–58. He denied practicing distress tolerance skills and completing therapy assignments and indicated he had been drinking alcohol to cope with his stress. Tr. at 458. SW Russell encouraged Plaintiff to complete the distress tolerance worksheets. *Id.*

On April 18, 2017, state agency consultant Kevin King, Ph.D. ("Dr. King"), reviewed the record and consider Listing 12.14 for trauma and stressor-related disorder. Tr. at 63–64. He found Plaintiff did not meet or equal the listing. Tr. at 63. He assessed a mild degree of impairment with respect to understanding, remembering, and applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* He rated Plaintiff as having a moderate degree of impairment in interacting with others. *Id.* Dr. King completed a mental residual functional

capacity ("RFC") assessment in which he indicated Plaintiff had moderately limited abilities to interact appropriately with the general public and to accept instructions and respond approximately to criticism from supervisors. Tr. at 67–68.

Plaintiff presented to Christopher Walker, M.D. ("Dr. Walker"), for a C&P exam of the knees and lower legs on April 13, 2017. Tr. at 435–44. Dr. Walker indicated Plaintiff's diagnoses included arthritic conditions and bilateral degenerative arthritis. Tr. at 435. Plaintiff reported worsening bilateral knee pain and occasional incidents in which his knees gave out, causing him to fall. Tr. at 436. He described his flare-ups as worsening with cold weather and standing for 15 to 30 minutes without resting. *Id.* Dr. Walker observed bilateral knee flexion from zero to 140 degrees and extension from 140 to zero degrees. Tr. at 436, 437. He noted localized tenderness or pain to palpation of the bilateral knees and objective evidence of crepitus. *Id.* However, he stated Plaintiff was able to perform repetitive use testing of his bilateral knees without additional functional loss of range of motion. Tr. at 437. Dr. Walker observed 5/5 bilateral knee strength with flexion and extension. Tr. at 439. He noted no muscle atrophy or ankylosis. Tr. at 439–40. He denied a history of recurrent subluxation, lateral instability, and recurrent effusion. Tr. at 440. He noted no joint instability on testing. Tr. at 440–41. Dr. Walker indicated Plaintiff occasionally used braces

and regularly used a cane to assist in ambulation. Tr. at 442. He indicated the conditions "negatively impact[ed Plaintiff's] ability to do work where he has to be on his feet for longer than 15–30 minutes," as he had to leave his prior job due to pain at work. Tr. at 443. He also noted Plaintiff experienced pain with non-weightbearing/at rest, with weight bearing, and with passive ROM. Tr. at 443–44.

On May 4, 2017, PT Clark observed Plaintiff to demonstrate antalgic gait and to slowly and cautiously alternate between sitting and standing. Tr. at 433.

Plaintiff followed up with SW Russell for psychotherapy on May 8, 2017. Tr. at 431. SW Russell observed dysthymic mood and affect, but no other abnormalities on MSE. Tr. at 432. Plaintiff reported he had increased his alcohol intake because of family stressors. *Id.* SW Russell encouraged Plaintiff to work on coping mechanisms and to follow up with the SATP. *Id.*

Plaintiff presented to Pravin Patel, M.D. ("Dr. Patel"), for an orthopedic consultative exam on May 9, 2017. Tr. at 412–18. He complained of back pain and arthritis in his bilateral knees and elbows. Tr. at 412. Dr. Patel observed normal ROM of Plaintiff's cervical spine, shoulders, wrists, and hips and negative straight-leg raising test in the sitting and supine positions. Tr. at 417. He noted reduced lumbar flexion at 60/90 degrees and reduced lumbar extension and lateral flexion at 5/25 degrees. *Id.* He indicated reduced

bilateral knee flexion at 130/150 degrees. *Id.* Dr. Patel observed Plaintiff to sit slowly from a supine position and to stand slowly from a sitting position. Tr. at 415. He noted Plaintiff got on and off the exam table slowly. *Id.* He indicated Plaintiff squatted up to 30% and did not perform tandem, heel, and toe walks. *Id.* He stated Plaintiff used a hand cane in the right hand and bilateral knee braces. *Id.* He observed slow gait and 4/5 motor power in all extremities. *Id.* He noted equal reflexes and no muscle atrophy. *Id.* He stated Plaintiff was mentally clear, coherent, and able to handle his funds. Tr. at 416. He assessed degenerative disc disease of the lumbar spine status post-lumbar spine surgery, osteoarthritis of both knees, hypertension, arthralgia of both elbows, PTSD, and history of borderline diabetes. *Id.*

Plaintiff presented to Dr. Zhang for psychiatry follow up on May 11, 2017. Tr. at 426. He reported difficulty dealing with his two rebellious teenage daughters. Tr. at 426. He endorsed depression and increased knee pain. *Id.* He admitted he was drinking a fifth of liquor approximately four days a week because of the stress. *Id.* He indicated Zoloft was helpful, but denied taking it when he was drinking. *Id.* He endorsed "bad" mood, insufficient energy, and feeling as if he could not be around a lot of people. *Id.* Dr. Zhang observed generally normal findings on exam, except that Plaintiff rated his mood as a five. *Id.* He advised Plaintiff to continue his medications and the SATP. *Id.*

On June 21, 2017, state agency medical consultant Irene Richardson, M.D. ("Dr. Richardson"), reviewed the record and provided the following physical RFC assessment: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; and frequently balance. Tr. at 65–67. State agency consultant Thomas O. Thomson, M.D. ("Dr. Thomson"), assessed the same physical RFC on October 13, 2017. *Compare* Tr. at 65–67, *with* Tr. 82–84.

Plaintiff complained of bilateral knee pain, back pain, and stomach ulcer on July 31, 2017. Tr. at 604. He endorsed stress-induced chest pain. *Id.* His blood pressure was elevated at 173/87 mm/Hg. Tr. at 605. Dr. Mayrit noted Plaintiff had a history of noncompliance with his medication and his refill history suggested he was not taking it. Tr. at 607. He indicated prior magnetic resonance imaging ("MRI") of Plaintiff's lumbosacral spine showed a previous laminectomy at L5 and disc deformity at L4–5 that was compatible with postoperative reaction. Tr. at 608.

During a psychiatric follow up visit on August 30, 2017, Plaintiff reported feeling tired after traveling for a funeral and his nephew's wedding. Tr. at 584. He endorsed drinking one 16-ounce beer every two weeks. *Id.* He

described feeling drowsy and distant and reported staying away from people to avoid being angered by others. *Id.* He endorsed nightmares and hypervigilance. Tr. at 584–85. He stated he sat at the back of his church because he was uncomfortable with others being behind him and declined to participate in contact sports because he did not want to be touched. Tr. at 585. He admitted to suicidal thoughts, but denied intent or plan. *Id.* He indicated he slept for one to two hours per night and experienced nightmares four to five times per week. *Id.* He reported feeling well-rested despite his sleep disturbance. *Id.* Megan Nagle, M.D. ("Dr. Nagle"), described Plaintiff's mood as "drowsy" and his insight as fair-to-good, but otherwise noted normal findings on MSE. Tr. at 586. She continued Plaintiff's medications. *Id.*

On September 25, 2017, SW Russell described Plaintiff's mood and affect as dysthymic, and Plaintiff endorsed passive suicidal ideation two weeks prior. Tr. at 705. Plaintiff indicated he had last consumed alcohol on August 26, 2017. *Id.* He continued to endorse nightmares and increased isolation. *Id.* SW Russell encouraged Plaintiff to use a safety model and coping skills. *Id.* Plaintiff agreed to be referred for adaptive re-orientation to anger group therapy. *Id.*

On October 3, 2017, SW Russell described Plaintiff's mood as dysthymic, and Plaintiff reported passive suicidal ideation three weeks prior. Tr. at 698. Plaintiff admitted he had one beer during a football game the

prior weekend, but denied other alcohol consumption since August. Tr. at 698. He complained of feeling challenged and anxious, but was coping by playing chess, reading, and walking. *Id.* SW Russell worked on safety issues, and Plaintiff indicated he would attend Alcoholics Anonymous ("AA") meetings. *Id.*

Plaintiff presented to Nurse Practitioner Randy G. Wallace ("NP Wallace"), for an initial consultation for bilateral knee pain on October 6, 2017. Tr. at 695. He described dull aching and throbbing pain he rated as a six-and-a-half. Tr. at 696. He stated his pain was exacerbated by climbing stairs, walking, prolonged sitting, and rising from a seated position. *Id.* He endorsed occasional swelling, but denied falls. *Id.* He was not using an assistive device. *Id.* NP Wallace observed Plaintiff to have antalgic gait, pain with palpation of the bilateral medial and lateral joint lines, intact sensation, negative anterior and posterior drawer tests, positive McMurray's sign, 5/5 strength, and no erythema, edema, infection, or effusion of the knee. Tr. at 697. He recommended bilateral intra-articular injections. *Id.*

On October 8, 2017, state agency consultant R. Warren, M.D. ("Dr. Warren"), reviewed the record and considered Listing 12.04 for depressive, bipolar, and related disorders, in addition to Listing 12.15. Tr. at 80–81. He found Plaintiff's impairment did not meet or equal either listing. Tr. at 80. He rated Plaintiff as having mild difficulties in understanding, remembering, or

applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* He assessed moderate difficulties in Plaintiff's ability to interact with others. *Id.* He completed a mental RFC assessment, indicating Plaintiff had moderately limited abilities to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. Tr. at 84–86.

NP Wallace administered bilateral knee injections on October 13, 2017. Tr. at 694–95.

An MSE was normal on October 16, 2017, but SW Russell observed Plaintiff to be limping upon presentation. Tr. at 693. Plaintiff felt "calm, happy, and proud," denied alcohol use, and indicated he had engaged in a variety of activities. *Id.* SW Russell worked on safe coping skills, and Plaintiff committed to staying sober and attending AA meetings. *Id.*

SW Russell indicated an MSE was normal on October 26, 2017. Tr. at 692. Plaintiff denied alcohol use since his prior visit and indicated he felt calm. *Id.* He said he attempted to attend an AA meeting, but was too nervous to go in. *Id.* SW Russell and Plaintiff worked on safe coping methods. Tr. at 692.

On October 30, 2017, Plaintiff reported he had been doing well until the prior weekend when he drank two beers after being sober for two months. Tr. at 686–87. He complained of conflict with his wife. Tr. at 686. He indicated he

was not taking his medication consistently. Tr. at 687. He endorsed feeling depressed, lack of energy, inability to be around a lot of people, sleeping for five hours per night, and nightmares. *Id.* Dr. Zhang indicated Plaintiff's affect was labile and his self-reported mood was a three. *Id.* He advised Plaintiff to take his medication daily and to attend the substance abuse and group treatment programs. Tr. at 687–88.

On November 9, 2017, SW Russell indicated an MSE was normal. Tr. at 685. Plaintiff endorsed feeling aggravated, anxious, and hopeless. *Id.* He denied attending AA, but said he had used good coping skills and had only consumed one beer since his prior visit. *Id.* SW Russell encouraged Plaintiff to engage in self-care activities. Tr. at 686.

SW Russell noted no abnormalities on an MSE on November 17, 2017. Tr. at 684. Plaintiff denied alcohol use and indicated he was using good coping skills. *Id.* He denied having attended AA. *Id.* He complained of feeling sluggish. *Id.* SW Russell and Plaintiff discussed coping methods, and Plaintiff planned to attend church. *Id.*

Plaintiff endorsed frustration with his family and passive suicidal ideation on December 11, 2017. Tr. at 680. He denied attending church and using good coping skills. *Id.* He reported drinking a liter of alcohol per day on three days since his prior visit. *Id.* He said he was taking his medication only

sporadically. *Id.* SW Russell helped Plaintiff to process his feelings, and Plaintiff agreed to attend church. Tr. at 681.

SW Russell noted a normal MSE, aside from recent suicidal ideation on January 4, 2018. Tr. at 675. Plaintiff reported feeling frustrated and drinking a fourth of a liter of alcohol three days a week since his prior visit. *Id.* He denied using good coping skills and attending church and AA meetings. *Id.* A PHQ suggested severe depression. Tr. at 676.

On January 18, 2018, Plaintiff reported that the prior knee injections had decreased his pain, swelling, and perception of impending instability for about a month. Tr. at 671. He described his knees as aching more with the cold weather. *Id.* Charles Rhoads, M.D. ("Dr. Rhoads"), observed grossly normal muscle bulk and tone, grossly intact sensation to light touch, tenderness to palpation along the joint lines, mild bilateral effusions, no ligamentous instability, and antalgic gait. Tr. at 672. He administered steroid injections to Plaintiff's bilateral knees. *Id.*

Plaintiff reported doing "a little better" on January 23, 2018. Tr. at 667. He continued to drink, but endorsed drinking much less. *Id.* He stated he was taking his medication for hypertension more consistently, but took his mental health medications only as needed. *Id.* Dr. Zhang described Plaintiff's affect as labile and all other elements of the MSE as normal. Tr. at 668. He continued Plaintiff's medications, instructed him to take them daily,

encouraged him to continue to attend the SATP and peer groups, and prescribed Prazosin 1 mg for three days and 2 mg thereafter. *Id.*

SW Russell noted no abnormal findings on MSE on March 12, 2018. Tr. at 662. Plaintiff reported continued difficulty sleeping, nightmares, insomnia, anxiety, depressed mood, negative cognitions and emotions, irritability/anger, hypervigilance, and avoidance behaviors. Tr. at 663. *Id.* He requested a referral to the trauma recovery program ("TRP"), and SW Russell honored his request. Tr. at 663.

Plaintiff participated in a consultation for the TRP on April 10, 2018. Tr. at 660. His mental health diagnostic study score indicated very severe symptoms of PTSD. Tr. at 653. His high depression and anxiety scale scores also warranted continued treatment. Tr. at 654–56. He requested to move forward with the TRP. Tr. at 661.

On April 19, 2018, Plaintiff reported the knee injections he received during his January visit had been effective. Tr. at 651. He described the injections as providing a few months of pain relief, but continued to endorse knee instability and stiffness. *Id.* Dr. Rhoads observed grossly normal muscle bulk and tone, grossly intact sensation to light touch, mildly antalgic gait, no effusion, tenderness to palpation along the joint lines, and no ligamentous instability. *Id.* He administered repeat steroid injections to Plaintiff's knees and ordered knee braces. Tr. at 651–52.

22

On April 30, 2018, Lyndsey Zoller, Psy. D. ("Dr. Zoller"), observed Plaintiff to demonstrate a depressed mood and affect and fair insight. Tr. at 761. Plaintiff endorsed recent suicidal ideation with plan and intent, but denied current suicidal ideation, intent, and plan. *Id.* He reported recently trying marijuana for the first time to treat his knee pain, but indicated he did not intend to use it again because he did not like the way it made him feel. Tr. at 762. He endorsed a history of heavy alcohol use beginning in 1990. *Id.* He stated he had been drinking a liter of liquor every other day until four months prior, when he started drinking approximately a 12-pack of beer every other day because he was concerned that the liquor was causing him to lose too much weight. *Id.* He completed a suicide safety plan with Dr. Zoller. Tr. at 763.

On May 7, 2018, Plaintiff presented to Dr. Zoller for a trauma history and assessment as related to the TRP. Tr. at 751. Dr. Zoller observed the following on MSE: good hygiene and appropriate appearance; cooperative behavior; alert and oriented to person, place, and time; denied current visual hallucinations; reported sleeping an average of 16 hours per week; endorsed occasionally, during periods of sleep deprivation, seeing image of a friend who hanged himself; organized and coherent thought process; and fair insight and judgment. Tr. at 752. He admitted drinking a 12-pack of beer every other day. *Id.*

Plaintiff presented to Alex McPherson, M.D. ("Dr. McPherson"), for a C&P exam on May 9, 2018, for pes planus. Tr. at 731–51. Dr. McPherson noted Plaintiff was diagnosed with bilateral degenerative arthritis and plantar fasciitis in 1991. Tr. at 732. Plaintiff described pain in his feet that was worsened by prolonged standing and walking. *Id.* He reported increased pain, burning, and swelling in his feet that occurred three to four times per week. Tr. at 733. Dr. McPherson noted the following with respect to Plaintiff's bilateral feet: pain on use; pain on manipulation; swelling on use; characteristic calluses; extreme tenderness of the plantar surfaces; excess fatigability; pain on movement; pain on weight bearing; pain on non-weight bearing; disturbance of locomotion; interference with standing; and lack of endurance. Tr. at 733–34. He referenced x-rays from May 27, 2015 that showed osteoarthritis of multiple levels that was worse on the left than the right. Tr. at 738–39. Dr. McPherson stated "any prolonged walking or standing may limit functional ability in the occupational setting." Tr. at 739, 751. He examined Plaintiff's knees and noted abnormal ROM, evidence of pain with weight bearing, and objective evidence of crepitus. Tr. at 741–42. He indicated pain on non-weight bearing was evident, as well as some pain with passive ROM of the bilateral knees. Tr. at 751. He noted normal flexion and extension strength in the bilateral knees. Tr. at 745–46. He observed normal findings on joint stability testing. Tr. at 747–48. Dr. McPherson

24

indicated Plaintiff constantly used braces and occasionally used a cane for locomotion. Tr. at 749.

On May 14, 2018, Dr. Zoller observed depressed mood and affect, but noted no other problems on MSE. Tr. at 728. She encouraged Plaintiff to review his safety plan. *Id.*

Plaintiff presented to psychologist Michele Parnell, Ph.D. ("Dr. Parnell"), for a C&P exam for PTSD on July 3, 2018. Tr. at 719–26. Dr. Parnell confirmed that Plaintiff had a diagnosis of PTSD that conformed to criteria in the *Diagnostic and Statistical Manual*, Fifth Edition ("*DSM-5*"), as well as an unspecified depressive disorder. Tr. at 719. She indicated Plaintiff had occupational and social impairment with reduced reliability and productivity. *Id.* Plaintiff reported sleep disturbance that resulted in him sleeping for two to three hours per night and sometimes staying up for two or three days at a time. Tr. at 721. He endorsed nightmares, cold sweats, avoidance behaviors, and intrusive thoughts. *Id.* He stated he avoided crowds, did not like for people to be behind him, and avoided attachment. *Id.* He endorsed depression, anxiety, difficulty with trust, a history of suicidal ideation, and periods of lower energy and motivation. *Id.* Dr. Parnell indicated Plaintiff had directly experience a traumatic event that resulted in the following: recurrent, involuntary, and intrusive distressing memories of the traumatic event; recurrent distressing dreams in which the content

25

and/or affect of the dream was related to the traumatic event; intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event; and marked physiological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic event. Tr. at 723. She noted Plaintiff persistently avoided stimuli associated with the traumatic event, beginning after the traumatic event occurred, as evidenced by avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event and avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event. *Id.* She indicated Plaintiff experienced negative alterations in cognition or mood following the traumatic events that included: persistent and exaggerated negative beliefs or expectations about oneself, others, or the world; persistent negative emotional state; markedly diminished interest or participation in significant activities; and feelings of detachment or estrangement from others. Tr.at 723–24. She stated Plaintiff had marked alterations in arousal and reactivity associated with the traumatic events, as evidenced by: irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects; hypervigilance; exaggerated startle

response; problems with concentration; and sleep disturbance. Tr. at 724. Dr. Parnell identified Plaintiff as having depressed mood, anxiety, suspiciousness, chronic sleep impairment, mild memory loss, difficulty in establishing and maintaining effective work and social relationships, difficulty in adapting to stressful circumstances, and suicidal ideation. Tr. at 725. She observed the following on MSE: alert and oriented; cooperative, but depressed mood; fluent speech with normal rate and tone; mildly constricted affect; tearful appearance; linear thought process; no overt psychosis; good immediate and remote memory; and denial of suicidal and homicidal ideation. *Id.* She considered Plaintiff capable of handling his finances. *Id.* Dr. Parnell concluded Plaintiff's PTSD and unspecified depressive disorder were at least as likely as not due to the incidents that occurred while Plaintiff served in the military. *Id.*

Plaintiff was discharged from the TRP on July 5, 2018, after failing to attend multiple sessions. Tr. at 717.

Plaintiff attended a mental status consultative examination with psychologist A. Nicholas DePace, Ph.D. ("Dr. DePace"), on November 28, 2018. Tr. at 775–79. He reported a history of conflicts with supervisors that led to him being fired and difficulty being around crowds. Tr. at 775–76. He said he stayed home "all of the time" and avoided public places because he was uncomfortable being around others. Tr. at 776. He indicated he typically

watched old sitcoms and the news, but avoided action and war movies because they triggered his symptoms. *Id.* He said he interacted with his wife and immediate family, as well as a brother who lived nearby, and spoke to his mother and other family members on the phone because he could not physically travel to visit them. *Id.* He stated his wife handled his finances because he was not good with money. *Id.* Plaintiff reported PTSD following an attempted sexual assault and witnessing the suicide of a friend while in the military. *Id.* He said he had been taking medication for depression and anxiety since 2016, but often declined to take his medications if they were causing nausea or vomiting or he was having a good day. Tr. at 776–77. He endorsed a history of nightmares and indicated he did not sleep for more than three hours at a time. Tr. at 777. He admitted to drinking up to four mixed liquor drinks on three to seven days per week. *Id.* He said the liquor he consumed did not cause him to be intoxicated or even feel a "buzz." *Id.* He noted he had reduced his alcohol intake since 2014 and continued to wonder if he had a problem with alcohol. *Id.* Dr. DePace described Plaintiff as casually dressed, appropriately groomed, using a cane to ambulate at a fairly normal pace, and appearing tired. *Id.* He stated Plaintiff was alert and oriented in all spheres and aware of current events. *Id.* He noted normal speech and psychomotor behaviors. *Id.* Dr. DePace observed a constricted range of affect. *Id.* He stated Plaintiff had coherent and goal-directed thought

processes and was functioning in at least the low-average intellectual range. *Id.* Plaintiff endorsed an irregular auditory hallucination of a voice calling his name and occasional peripheral visual disturbances. *Id.* He denied thoughts of self-harm. *Id.* He was able to follow directions without significant difficulties. *Id.* Dr. DePace noted Plaintiff's "significant preoccupation with his physical functioning and tearfulness when discussing some of his struggles, although there was no significant evidence of anxiety, fearfulness, hopelessness, disordered thought, or anger during th[e] evaluation." Tr. at 777–78. His diagnostic impressions included: unspecified depressive disorder; likely longstanding alcohol use disorder; consider PTSD; probable partner-relational problems; financial problems; probable medical noncompliance; and reported medical and physical problems. Tr. at 778. He stated although there was no evidence that Plaintiff was intentionally attempting to fabricate or exaggerate his problems, "it does appear likely that his self-described perceptions of his struggles minimized aspects of his functioning that contribute to his current difficulties; most notably, these would include his potential longstanding alcohol use disorder and medication noncompliance." Tr at 778–79. Dr. DePace completed a medical source statement as to Plaintiff's ability to do mental work-related activities. Tr. at 781–83. He indicated Plaintiff had moderate limitation as to the ability to make judgments on complex work-related decisions. Tr. at 781. He wrote: "While he

has no cognitive deficits, his reported struggles with 'focusing' could be impacted by a variety of factors, including problematic alcohol use, numerous life stressors that cause anxiety, and medication noncompliance." *Id.* He noted Plaintiff had moderate impairment in his abilities to interact appropriately with the public, supervisors, and coworkers and to respond appropriately to usual work situations and to changes in a routine work setting. Tr. at 782. He wrote: "He appears to currently have some struggles with anxiety & depress[ive] symptoms due to a variety of factors, including substance (alcohol) use, medication noncompliance, [and] many life stressors, that could impact h[is] abilities to interact with others." *Id.* He indicated Plaintiff could not manage benefits in his own best interest because of "likely alcohol use disorder." Tr. at 783.

On December 17, 2018, Nurse Practitioner Latavia S. Harrison ("NP Harrison"), examined Plaintiff pursuant to a C&P exam for knee and lower leg conditions. Tr. at 785–98. She noted Plaintiff used knee braces, but did not note use of a cane. Tr. at 794–95. She indicated Plaintiff's conditions would affect his ability to perform occupational tasks, writing: "He reports decreased mobility and inability to stand, walk or sit for extended periods, and decreased ability to lift items required of his job." Tr. at 795. NP Harrison noted objective evidence of pain on passive ROM testing and

evidence of damage to the opposing joint, but no objective evidence of pain when the joint was used in non-weight bearing. Tr. at 796.

### 3.    Other Agency Decision

On July 18, 2018, the Department of Veterans Affairs ("VA") issued a rating decision granting Plaintiff a 70% rating for PTSD effective June 21, 2016, and entitlement to individual unemployability[2] benefits effective August 19, 2016. Tr. at 267. Impairment ratings of 10% for left knee degenerative arthritis and 50% for bilateral plantar fasciitis with degenerative arthritis and plantar warts were continued. Tr. at 269.

### C.    The Administrative Proceedings

### 1.    The Administrative Hearing

#### a.    Plaintiff's Testimony

At the hearing on November 1, 2018, Plaintiff testified he was right-handed, 5'10" tall, and weighed 195 pounds. Tr. at 33. He stated he was married and had nine children, four of whom were minors, ages 17, 12, 13, and eight. Tr. at 33–34. He indicated he lived in an apartment with his wife and 17-year-old daughter. Tr. at 34–35.

---

[2] The decision states: "Pursuant to 38 CFR § 4.16, total disability ratings for compensation may be assigned, where the schedular rating is less than 100 percent, when, in the judgment of the rating agency, the veteran is physically or psychologically incapable of securing or following a substantially gainful occupation as a result of service-connected disability." Tr. at 273. It later provides: "Entitlement to Individual Unemployability is granted because you are unable to secure or follow a substantially gainful occupational as a result of service-connected disabilities." Tr. at 275.

Plaintiff testified he received benefits from the VA based on a 90% disability impairment rating. Tr. at 35. He denied having a driver's license, indicating his license had been suspended following a conviction for DUI in 2005 and had not been reinstated. Tr. at 35. He indicated his wife drove him if he needed to travel by car, but stated he rarely went anywhere. *Id.* He said his wife paid the household bills, but admitted he could likely pay bills if necessary. Tr. at 36.

Plaintiff testified he took medication for anxiety, PTSD, and depression. Tr. at 41. He stated the medication provided some relief, but he sometimes had difficulty taking it because it caused nausea. *Id.* He indicated his doctor had tried different medications to alleviate the side effect. *Id.* He stated he completed a PTSD class. *Id.* He said he had not seen his counselor since August, but had previously seen a counselor as often as three times a week. Tr. at 41–42. He denied having been hospitalized for mental symptoms. Tr. at 42. He said he had panic attacks during the night on three nights per week. *Id.* He described his panic attacks as being triggered by memories of having to cut down a friend who committed suicide by hanging himself. Tr. at 43. He said large crowds also triggered his panic attacks and he tried to avoid them. *Id.*

Plaintiff testified he continued to have problems with his back. *Id.* He said he could not sit or stand for long periods. *Id.* He described right-sided

numbness and increased problems upon changes in weather. *Id.* He said he could barely move, could not tie his shoes, and relied on his wife's help to dress. *Id.* He described pain in his lower back and legs and rated it as typically an eight-and-a-half. Tr. at 44. He said he did not like taking medication, but would sometimes take Motrin or use a heating pad for his back pain. *Id.* He said Motrin provided no relief, but a heating pad helped the pain to subside for a little while. Tr. at 46.

Plaintiff said his right knee would swell up and give out on him. *Id.* He rated his knee pain as a nine and indicated it was not reduced by Motrin. *Id.* He said he applied a sporting alcohol to his knee that provided some relief, but did not help with stiffness. *Id.* He indicated he wore knee braces that helped him to stand. Tr. at 46–47. He said Dr. Maybit had told him he might need knee surgery, but he was planning to consult a private physician because he did not want for doctors at the VA to operate on him. Tr. at 47.

Plaintiff described his shoulders as "locking up" and demonstrating limited ROM. *Id.* He said his wife would apply heat to his shoulders and rub them down with sporting alcohol. *Id.* He rated his pain as an eight-and-a-half. *Id.* He said he was unable to lift his arms above his head when the temperature was cold or if he did something strenuous. Tr. at 47–48.

Plaintiff testified he could sit for an average of 15 minutes at a time. Tr. at 48. He said he could stand for three to five minutes and did not do a lot

of walking. *Id.* He estimated he could lift 10 pounds. *Id.* He denied being able to bend down and pick up items and kneel on one knee and said he was limited in his abilities to squat and crawl. Tr. at 48–49.

Plaintiff denied cooking, vacuuming, sweeping, mopping, and shopping for groceries, but said he washed some dishes and separated and folded clothes. Tr. at 49. He denied attending church, visiting family and friends, and going out to eat. *Id.* He said that on a typical day, he read the Bible, watched television, spoke on the phone with his mother, went outside, and performed small chores like making his bed and picking up after his three-year-old adopted son. Tr. at 49–50. He said he could prepare a sandwich. *Id.*

Plaintiff testified he was only sleeping from 30 minutes to two hours at a time during the night. Tr. at 51. He said he felt tired during the day. *Id.* He stated he sometimes nodded off, but did not sleep for long. Tr. at 52. He said his memory had worsened and his wife often had to remind him of things. *Id.* He said he had difficulty retaining what he read and sometimes relied on his daughter to read things to him. *Id.*

### b.    Vocational Expert Testimony

Vocational Expert ("VE") J. Adger Brown reviewed the record and testified at the hearing. Tr. at 53–56. The VE categorized Plaintiff's PRW as an informal youth counselor, *Dictionary of Occupational Titles* ("*DOT*") No. 195.367-034, as requiring light exertion with a specific vocational preparation

("SVP") of 6; a janitor, *DOT* No. 381.687-018, as requiring medium exertion with an SVP of 2; a material handler, *DOT* No. 929.687-030, as requiring heavy exertion with an SVP of 3; and a kitchen helper, *DOT* No. 318.687-010, as requiring medium exertion with an SVP of 2. Tr. at 54. The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited to light work with occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent balancing; occasional stooping; no kneeling, crouching, or crawling; must avoid concentrated exposure to dangerous machinery and heights; limited to no more than simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple work-related instructions and decisions and relatively few workplace changes; requiring no more than occasional interaction with coworkers and no interaction with the public; and could maintain concentration, persistence, or pace for two-hour increments. Tr. at 54–55. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 55. The ALJ asked whether there were any other jobs that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of 2 as a grader/sorter, *DOT* No. 788.687-106, a quality control examiner, *DOT* No. 739.687-102, and a product tester, *DOT* No. 922.687-054, with approximately 25,000, 60,000, and 6,000 positions available nationally, respectively. *Id.* He stated the numbers he identified represented about 50

percent of the full range of work within the described occupations because of a reduction for the need to avoid high-speed production. Tr. at 55–56.

The ALJ provided a second hypothetical that modified the first hypothetical to permit the individual to be off-task for 20 percent of the workday. Tr. at 56. The VE testified the person would be unable to perform any work if he were persistently off-task for 20 percent of the workday. *Id.*

Prior to concluding the hearing, the ALJ announced that he would refer Plaintiff for a psychological consultative examination prior to issuing a decision in the case. Tr. at 57.

### 2.    The ALJ's Findings

In his decision dated March 25, 2019, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.
2.    The claimant has not engaged in substantial gainful activity since September 20, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has the following severe impairments: laminectomy of the lumbar spine secondary to degenerat[ive] disc disease of the lumbar spine; depression; anxiety; post-traumatic stress disorder; obesity; and degenerative joint disease of the knees (20 CFR 404.1520(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is limited to occasional climbing of ramps and stairs; no climbing of

ladders[,] ropes or scaffolds; can perform frequent balancing; can perform occasional stooping; never perform kneeling[,] crouching or crawling; must avoid concentrated exposure to dangerous machinery and heights; is further limited to occupations requiring no more than simple[,] routine[,] repetitive task[s], not performed in a fast paced production environment, involving only simple work related instructions and decisions and relatively few work place changes; is limited to occupations requiring only occasional interaction with co-workers and none with members of the general public; and will be able to maintain concentration[,] persistence and pace for 2 hour increments.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on May 1, 1967 and was 49 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 20, 2016, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 14–22.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ failed to properly evaluate Dr. Walker's opinion;

2)    the ALJ did not explain his findings as to Plaintiff's RFC in accordance with SSR 96-8p; and

3)    the ALJ did not consider Plaintiff's subjective allegations in accordance with SSR 16-3p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

## A.    Legal Framework

### 1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial

gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

###### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the

decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

      B.    Analysis

      1.    Dr. Walker's Opinion

On April 13, 2017, Dr. Walker provided the following opinion pursuant to the C&P exam:

> [Plaintiff] has [degenerative joint disease] of both knees with good ROM but does have pain with movement and on standing that limits his ability to be on his feet for long periods of time. [F]or that reason, it is likely that his knees would negatively impact his ability to perform duties at work that require him to be on his feet for more than 15–30 min at a time or manual labor type of work. [I]t would not render him incapable of duties at a sedentary position.

Tr. at 444.

Plaintiff argues the ALJ failed to apply the applicable factors in 20 C.F.R. § 404.1520(c) in evaluating Dr. Walker's opinion. [ECF No. 13 at 17–18]. He maintains Dr. Walker provided specific restrictions that were supported by objective findings. *Id.*

The Commissioner argues substantial evidence supports the ALJ's decision to allocate no special weight to Dr. Walker's opinion given contradicting evidence in his records. [ECF No. 15 at 16]. He claims the court must defer to the ALJ's determination because he provided a good reason for discounting Dr. Walker's opinion. *Id.*

Pursuant to 20 C.F.R. § 404.1527(a)(1),[5] "[m]edical opinions are statements from acceptable medical sources that reflect judgment about the nature and severity of [the claimant's] impairments, including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." ALJs are required to "evaluate every medical opinion [they] receive." 20 C.F.R. § 404.1527(c). When a treating source's medical opinion is not given controlling weight, five factors are utilized to determine what lesser weight should instead be accorded to the opinion." *Brown v. Commissioner Social Security Administration*, 873 F.3d 251, 256 (4th Cir. 2017). These factors include "[l]ength of the treatment relationship and the frequency of examination," "[n]ature and extent of the treatment relationship," "'[s]upportability' in the form of the quality of the explanation provided for the medical opinion and the amount of relevant evidence—'particularly medical signs and laboratory findings'—substantiating it," "'[c]onsistency,' meaning how consistent the medical opinion is with the record as a whole,'" and "'[s]pecialization,' favoring 'the medical opinion of a specialist about medical issues related to his or her area of specialty.'" *Id.* (citing 20 C.F.R. 404.1527(c)(2)(i), (ii), (3), (4),

---

[5] Because Plaintiff filed his claim prior to March 27, 2017, the undersigned considers the ALJ's evaluation of medical opinions based on the rules codified by 20 C.F.R. § 404.1527. *See* 20 C.F.R. § 404.1520c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 apply"); *see also* 82 Fed. Reg. 15,263 (stating the rescissions of SSR 96-2p, 96-5p, and 06-3p were effective for "claims filed on or after March 27, 2017").

(5)). The ALJ should also consider "any other factors 'which tend to support or contradict the medical opinion.'" *Id.* (citing 20 C.F.R. § 404.1527(c)(6)). The regulations directs ALJ's to generally allocate greater weight "to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [him]." 20 C.F.R. § 404.1527(c)(1).

> The ALJ addressed Dr. Walker's opinion as follows:
>
> In April 2017, Christopher Walker, M.D., a treating physician, indicated that the claimant could not be on his feet more than 15 to 30 minutes but that the claimant's impairments would not render him unable to perform duties at a sedentary level (Exhibit 4F). I have given less weight to this opinion because Dr. Walker has not provided a detailed functional assessment of the claimant's functional abilities.

Tr. at 20.

It is not clear from the ALJ's explanation or elsewhere in the decision what he means by this statement that the ALJ declined to provide "a detailed functional assessment of the claimant's functional abilities." *See id.* Dr. Walker's statement is a medical opinion, as it reflects his judgment of Plaintiff's physical restrictions. *See* 20 C.F.R. § 404.1527(a)(1). Physical restrictions address physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1522(b). Dr. Walker addressed Plaintiff's abilities to stand, walk, and sit, which were three specific physical functions. *See* Tr. at 444. The regulations

44

do not require that medical opinions follow any prescribed formula or address all physical functions. *See* 20 C.F.R. § 404.1527(a)(1).

The ALJ's explanation for his allocation of "less weight" to Dr. Walker's opinion also ignores relevant factors in 20 C.F.R. § 404.1527(c). The record indicates Dr. Walker was an examining physician, as he performed a one-time C&P exam. *See* Tr. at 435–44. Despite the ALJ's mischaracterization of Dr. Walker as a treating physician, he did not consider whether his findings on exam supported his opinion that Plaintiff could not "be on his feet for more than 15–30 min at a time" and was limited to sedentary work. *See* 20 C.F.R. § 404.1527(c)(3). Dr. Walker's opinion was arguably supported by his observations of reduced bilateral knee flexion and extension, localized tenderness or pain to palpation of the bilateral knees, and crepitus. Tr. at 436, 437. The ALJ also declined to address whether Dr. Walker's opinion was consistent with the other objective evidence and opinions of record. *See* 20 C.F.R. § 404.1527(c)(4). The record shows Dr. Patel and Dr. McPherson noted similar observations. *Compare* Tr. at 435–44, *with* Tr. at 412–18, 733–34, 741–42, and 751. Other physicians also indicated Plaintiff would have difficulty engaging in prolonged standing and walking. *See* Tr. at 404 (reflecting Dr. Reynolds's notation that difficulty with ambulating and standing would functionally impact Plaintiff's employment status),    739

(including Dr. McPherson's impression that "any prolonged walking or standing may limit functional ability in the occupational setting").

In light of the foregoing, the court finds substantial evidence does not support the ALJ's weighing of Dr. Walker's opinion.

### 2.    RFC Assessment

Plaintiff argues the ALJ did not explain his RFC assessment as required pursuant to SSR 96-8p. [ECF No. 13 at 18–23].

The Commissioner maintains the ALJ accounted for all of Plaintiff's credibly-established limitations in the RFC assessment. [ECF No. 15 at 11].

A claimant's RFC represents the most he can do despite his limitations. 20 C.F.R. § 404.1545(a). The RFC assessment should consider all the relevant evidence and account for all of the claimant's medically-determinable impairments. *See id.* The RFC assessment must include a narrative discussion describing how all the relevant evidence supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7 (1996). "Thus, a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019).

The ALJ must explain how any material inconsistencies or ambiguities in the record were resolved. SSR 16-3p, 2016 WL 1119029, at *7. "[R]emand

may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

          a.     Use of Cane

Plaintiff specifically maintains the ALJ did not resolve evidence as to his need for an assistive device to ambulate. [ECF No. 13 at 20–22]. The Commissioner claims the ALJ thoroughly considered and accounted for Plaintiff's allegations that he required a cane. [ECF No. 15 at 3].

Pursuant to SSR 96-9p, 1996 WL 374185, at *7, "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distances and terrain; and any other relevant information)."

The ALJ acknowledged Plaintiff's report that he could stand for 15 to 30 minutes, but noted he was "observed to transfer independently (Exhibit 4F)" and stated "other treatment notes revealed that the claimant ambulated without difficulty (Exhibit 6F)." Tr. at 18. He noted that Plaintiff "ha[d] been prescribed a cane and use[d] bilateral knee braces (Exhibits 7F and 11F)." *Id.*

The ALJ recognized that Plaintiff "walked with a cane" during his consultative exam with Dr. Patel. Tr. at 19. Thus, the ALJ acknowledged that the record presented some conflicting evidence as to whether it was necessary for Plaintiff to use a cane.

Although the ALJ was not required to find a cane medically-necessary given the evidence of record, he was required to resolve the conflicting evidence and explain his reasons for declining to include use of a cane in the RFC assessment. *See* SSR 16-3p, 2016 WL 1119029, at *7; *Mascio*, 780 F.3d at 636. Instead of providing a reason for declining to include a provision for use of a cane in the RFC assessment, the ALJ included no provision for use of a cane without explanation—neglecting the logical explanation component of the RFC assessment that the Fourth Circuit recognized in *Thomas*, 916 F.3d at 311. His decision lacks the required logical bridge between the evidence and his conclusion. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016). Therefore, substantial evidence does not support the ALJ's RFC assessment.

b.     Ability to Respond to Supervisors

Plaintiff argues the RFC assessment fails to reflect the "great weight" the ALJ gave the psychological consultants' opinion that he was moderately limited in his ability to respond appropriately to criticism from supervisors. [ECF No. 13 at 22–23].

The Commissioner maintains the ALJ considered evidence of Plaintiff's problems with supervisors in the RFC assessment. [ECF No. 15 at 3].

The ALJ acknowledged Dr. King's opinion that Plaintiff "was moderately limited in his ability to interact with the general public and to accept instruction and respond appropriate[ly] to criticism from supervisors (Exhibit 1A)." Tr. at 19. He recognized that Dr. Warren "confirmed the determination of Dr. King (Exhibit 5A)." *Id.* He noted Dr. DePace "reported that the claimant had . . . moderate difficulties interacting appropriately with the public, coworkers, and supervisors; and moderate difficulties with responding appropriately to usual work situations and to changes in a routine work setting (Exhibit 10F)." *Id.* The ALJ found these opinions "very persuasive because they [were] each well-documented and consistent with evidentiary record and supported by objective measures." *Id.* He gave them "great weight in arriving at residual functional capacity." *Id.*

Despite his allocation of "great weight" to opinions from Drs. King, Warren, and DePace and his acknowledgment that they indicated Plaintiff would be restricted in his ability to work with and respond to supervisors, the ALJ limited Plaintiff in the RFC assessment to "occasional interaction with co-workers and none with members of the general public" without addressing his ability to interact with supervisors. Remand is appropriate in light of the

ALJ's failure to assess Plaintiff's ability to perform this relevant function. *See Mascio*, 780 F.3d at 636.

### 3. Subjective Allegations

Plaintiff argues the ALJ did not evaluate his subjective symptoms in accordance with the provisions of SSR 16-3p. [ECF No. 13 at 23–24]. He maintains the ALJ indicated some of his allegations were supported by the evidence and others were not, without explaining which allegations were and were not supported. *Id.* at 24.

The Commissioner argues the ALJ discussed evidence that conflicted with Plaintiff's allegations, including relatively benign objective findings, a conservative treatment history, and Plaintiff's continued ability to independently perform activities of daily living ("ADLs"). [ECF No. 15 at 17].

"[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). Second, and only if the claimant's impairments could reasonably produce the symptoms he alleges, the ALJ must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to

determine the extent to which they limit [his] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)).

The ALJ is required to "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6. However, he is not to evaluate the claimant's symptoms "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* at *4. The ALJ is to consider other evidence that "includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." *Id.* at *5; *see also* 20 C.F.R. § 404.1529(c) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms).

Pursuant to SSR 16-3p, the ALJ is to explain which of the claimant's symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2016 WL 1119029, at *8. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts

that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869 (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). He must evaluate the "individual's symptoms considering all the evidence in his or her record." SSR 16-3p, 2016 WL 1119029, at *8.

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause the symptoms he alleged, but found his statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. at 18. He acknowledged mental status exams showed some evidence of "preoccupation and tearfulness" and dysthymic mood and affect, but generally indicated Plaintiff was neatly groomed, dressed appropriately, oriented in all four spheres, had logical and goal-directed thought processes, and had no suicidal or homicidal intent or plan. *Id.* He cited Dr. DePace's observation that Plaintiff could "follow[] directions without significant difficulties and was able to respond to questions asked of him." *Id.* He noted Plaintiff's ADLs included reading the Bible. *Id.* He acknowledged a remote history of lumbar laminectomy. *Id.* He stated treatment records "provide[d] support for the claimant's [knee] impairments." *Id.* However, he noted inconsistency between Plaintiff's testimony and "treatment records [that]

indicated that the injections provided months of relief of the claimant's knee symptoms." Tr. at 18–19. He discussed Dr. Patel's observations, which included some normal findings and some abnormalities. Tr. at 19. He found "that the allegations made with regards to the claimant's overall abilities and limitations [were] considered somewhat supported, but inconsistent with a finding of disability." *Id.*

The ALJ did not fully comply with SSR 16-3p's requirement that he explain which of Plaintiff's symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." He specifically rejected Plaintiff's testimony as to difficulty reading as inconsistent with his testimony that he read the Bible daily and found his testimony that knee injections were ineffective to be inconsistent with his reports to his physician. *See* Tr. at 17, 18–19. However, the ALJ gave no reasons for rejecting Plaintiff's claims that he was unable to sit or stand for extended periods and lift over 10 pounds and slept for only a few hours per night. He specifically acknowledged "the evidentiary record provide[d] some support for his allegations" of mental impairment, Tr. at 18, but did not acknowledge which allegations he considered to be supported by the record and which he rejected or his reasons for accepting and rejecting the allegations. He similarly wrote "treatment records [as to Plaintiff's knee impairments] provide[d] support for [his]

impairments," Tr. at 18, but did not explain which allegations related to the knee impairments he accepted and rejected. In light of the foregoing, the ALJ did not evaluate Plaintiff's subjective allegations in accordance with 20 C.F.R. § 404.1529 and SSR 16-3p.

### 4. Remand for Award of Benefits

Plaintiff requests the court remand the case for an award of benefits and, in the alternative, requests a remand for additional administrative proceedings. [ECF No. 13 at 25].

The Commissioner argues a remand for an award of benefits is inappropriate under the presented circumstances. [ECF No. 15 at 17–18].

"Whether to reverse and remand for an award of benefit or remand for a new hearing rests within the sound discretion of the district court." *Smith v. Astrue*, C/A No. 10-66-HMH-JRM, 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011) (citing *Edwards v. Bowen*, 672 F. Supp. 230, 237 (E.D.N.C. 1987)). "The Fourth Circuit has explained that outright reversal—without remand for further consideration—is appropriate under sentence four 'where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose'" and "where a claimant has presented clear and convincing evidence that he is entitled to benefits." *Goodwine v. Colvin*, No. 3:12-2107-DCN, 2014 WL 692913, at *8 (D.S.C. Feb. 21, 2014) (citing

*Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974); *Veeney ex rel. Strother v. Sullivan*, 973 F.3d 326, 333 (4th Cir. 1992). An award of benefits is appropriate when "a remand would only delay the receipt of benefits while serving no useful purpose, or a substantial amount of time has already been consumed." *Davis v. Astrue*, C/A No. 07-1621-JFA, 2008 WL 1826493, at *5 (D.S.C. Apr. 23, 2008) (citing *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984); *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982)). "On the other hand, remand is appropriate 'where additional administrative proceedings could remedy defects . . . .'" *Id.* (quoting *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989).

The ALJ erred in: (1) declining to explain how he considered the regulatory-relevant factors in weighing the examining physician's opinion; (2) failing to include or provide reasons for declining to include provisions for use of a cane in the RFC assessment; (3) overlooking evidence of impaired ability to interact with supervisors in the RFC assessment; and (4) neglecting to clarify and explain which of Plaintiff's subjective allegations he accepted and rejected. All the ALJ's errors pertain to failures to provide rationale to support the conclusions he reached. The court finds the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard, nor that claimant has presented clear and convincing evidence that he is entitled to benefits. *See Goodwine*, 2014 WL

692913, at *8. Therefore, a remand for an award of benefits is not appropriate, and the undersigned remands for additional administrative proceedings.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

July 16, 2020                              Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge